[Cite as *In re A.B.*, 2013-Ohio-3405.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

IN THE MATTER OF:          :

    A.B., et al.          :          CASE NO.   CA2013-03-024

              :          O P I N I O N
              8/5/2013

              :

              :

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2010 JC 04121

D. Vincent Faris, Clermont County Prosecuting Attorney, Judith A. Brant, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellee, Clermont County Department of Job & Family Services

Julie D. Steddom, 134 North Front Street, Ripley, Ohio 45167, for appellants, B. & A.H.

Ryan L. DeBra, 4914 Ridge Avenue, Cincinnati, Ohio 45209, for A.H.

R. Aaron Maus, 302 East Main Street, Batavia, Ohio 45103, for A.B.

Deborah L. Suckow, 2400 Clermont Center Drive, Batavia, Ohio 45103, guardian ad litem

**PIPER, J.**

{¶ 1} Petitioners-appellants, the maternal grandparents (Grandparents) of A.B., A.B., and A.B., appeal a decision of the Clermont County Court of Common Pleas, Juvenile Division, denying their motion for custody of the three children.

{¶ 2} Grandparents' daughter is the mother (Mother) to the three children in question. Mother has never been married to the children's father (Father), but the two lived together for several years. During this time, Father was convicted of importuning Mother's 11-year-old niece, and was classified a Tier I sexual offender as a result of the importuning conviction. Accusations also arose that Father was sexually abusing the three children, who were six, five, and 18 months old.

{¶ 3} The children first became involved with the Clermont County Children's Services Agency (the agency) when the youngest child was seen at Children's Hospital for bruises on her face and a broken clavicle. The agency substantiated the abuse claim, and determined that the child's injuries had been caused by Mother. Criminal charges were brought against Mother, and she was eventually convicted and sentenced to community service for her actions. The children were removed from Mother and Father's home, and placed with Grandparents.

{¶ 4} Despite Father's importuning conviction, Tier I sexual classification designation, and the allegations of sexual abuse, Mother refused to make Father leave the home. A safety plan was instituted by the agency, which included parenting classes and other therapy for Mother and Father. Once Mother's family convinced Mother that she would only get the children back by making Father leave the home, Mother "kicked" him out. Father was permitted to have supervised visitation with the children. Father also submitted to a diagnostic assessment as part of a sex offender treatment program.

{¶ 5} On March 5, 2010, the agency filed a complaint with the juvenile court, and alleged that the children were dependent. The agency stated that it had recently received results of Father's diagnostic assessment, and that the results were "very concerning" because Father minimized his actions and stated that he did not need treatment even though the results indicated that Father was in need of intensive therapy. Mother also expressed her

belief to the agency that Father had not sexually abused the children and stated that she wanted him to move back into the home. Based on the potential for the children to be exposed to Father and Mother's lack of willingness to protect the children, the agency asked the court to adjudicate the children dependent.

{¶ 6} The juvenile court held a hearing on the agency's complaint and granted temporary custody of the three children to the agency. A guardian ad litem (GAL) was appointed to represent the children's interest, and she expressed concerns regarding Mother's unwillingness to protect the children. Mother told the GAL that she did not want to be separated from Father, and that her 11-year-old niece was not "an innocent party" regarding the importuning charge against Father.

{¶ 7} At the time of the initial adjudication, the oldest child had not been enrolled in school because Mother and Grandmother did not have a car and believed that walking the child to the bus stop a few blocks away from the child's home was "too difficult." As a result, when the child was finally enrolled in school she was behind in her education and was forced to repeat kindergarten.

{¶ 8} When the children were placed with Grandparents, they expressed frustration with the children because they were difficult to care for. For example, Grandmother told the children's GAL that the children throw fits, the oldest child smacks the younger children for no reason, and that the youngest child "kicks and screams and squeals" when her diaper or clothes are changed. The GAL expressed concerns that the 18-month-old child's actions during diapering and clothing changes were indicative of "prior inappropriate touching" by Father.

{¶ 9} The GAL noted that Grandmother extolled the virtues of physical discipline for over 15 minutes during one visit, and that she was frustrated that she and Grandfather were not permitted to spank the children as a condition of the agency's policy regarding child

discipline. Grandmother also stated that she "could see how child abuse could be committed," but later added that she would never cross the "fine line" between discipline and abuse.

{¶ 10} The GAL also noted that Grandmother has several physical ailments that prohibit interaction with the children. The GAL noted that Grandmother is "inactive" and that "getting around is difficult for her." The GAL also noted that instead of interacting with the children, Grandmother sits and "directs" the children from her chair. Grandfather works two jobs, second and third shift, and sleeps during the day.

{¶ 11} When the GAL visited with Grandparents a second time, Grandmother expressed that she was adjusting to having the children in the home. The oldest child had been diagnosed with ADD and was also prescribed medication to help her sleep, which she could not do before because of nightmares.

{¶ 12} On May 11, 2010, the juvenile court held another hearing, and declined to return the children to Mother. Mother tried to commit suicide a few days later, and spent several days in the hospital as a result. From 2009 forward, Mother lived with Grandparents on a regular basis.

{¶ 13} The child agency performed a home study on Grandparents to determine if placing the children there on a more permanent basis was an option. However, Grandparents failed the home study. Several concerns were expressed by the agency as well as representatives from Child Focus, who came into the home to assist Grandparents' adjustment to caring for the children. The concerns expressed included Grandparents not keeping medication locked in an inaccessible location from the children, not having a bed for the youngest child, and Grandmother continually using corporal punishment even though it was forbidden as part of the children's placement.

{¶ 14} The representative who completed the home study testified to other concerns.

First, Grandparents were not compliant with the home study process itself and the study took over four months to complete. Second, Grandfather expressed his dislike for government and disagreed with the agency's policy of forbidding corporal punishment while the children are in agency custody. Third, the worker expressed concerns regarding Grandparents' parenting techniques. For example, Grandparents described the oldest child as "completely out of control" and stated that they did not know how to control her. One parenting technique they considered to discipline the oldest child was to lock her out of the room while they ate her favorite meal and dessert. Fourth, the worker expressed concerns regarding the stress level of the family. Grandparents also had another of their daughters living with them at the time of the home study, as well as that daughter's husband and child, and stress levels were high in the family due to all of the children and people living in one trailer. Fifth, the worker expressed concerns with Grandparents' ability and willingness to cooperate with agency policies and recommendations. For example, the worker suggested alarms on the doors so that Grandmother could be alerted when the children ran from the house. However, Grandmother did not put the alarms in place, and instead, decided to sleep in an oversized chair near the doorway of the children's room "to prevent the children from getting out and running through the home." The workers' sixth and seventh concerns were specific to the oldest child, who she felt was singled out because of her behavior and Grandparents' inability to control the child. As a result of the failed home study, the children were removed from Grandparents' care and placed in foster care.

{¶ 15} The children did very well in foster care. The oldest child began sleeping through the night with no nightmares, controlled her symptoms of ADD, and was doing much better in school. The oldest child was behaving better, was not hitting and pushing other children as she had in the past, and was able to write and read. The middle child was also enrolled in school and doing well. The youngest child was weaned from her bottle and

pacifier, and was being potty trained.

{¶ 16} In October 2010, Mother moved the court to return the children to her, stating that she had maintained housing and employment, and had also been committed to preventing contact between Father and the children. In January 2011, the children were returned to Mother under a protective supervision order. The court ordered "no contact" between Father and the children.

{¶ 17} Once in Mother's care again, the children regressed. The oldest child began misbehaving once more, including acting out in school. The middle child was no longer permitted to ride the school bus because she kicked, hit, and spit at other children. The middle child was also asked to leave day care after she continually hit and pushed other children, told teachers she was going to kill them, and kicked the teachers in the legs. The youngest child was no longer potty trained and reverted to diaper usage. The GAL visited with the children while in Mother's care and noted that the children were unkempt and dirty, that Mother's front door did not lock properly, and that furniture in the living room was broken. Mother had not worked for several months, and relied on others to provide necessities. Mother also continued to have contact with Father, and suggested to the GAL that Father was ready to be back in their lives. The GAL also noted that Mother's parenting style had not improved, and that she chose to yell continually at the children rather than talk to them.

{¶ 18} Mother moved back in with Grandparents in order to conserve resources, and Grandmother often provided care for the children when Mother would take naps throughout the day. Also during this time, the oldest child was diagnosed with post-traumatic stress disorder (PTSD), continued to receive medication for her ADD, and was also prescribed anti-psychotic medication. The middle child was also diagnosed with ADD and was prescribed anti-psychotic medication and mood stabilizers, as well as a medication to help the child sleep through the night.

{¶ 19} In December 2011, Mother was charged with child endangering. The charges stemmed from Mother allowing the oldest child, who was eight by this time, to walk home by herself from the house of the child's aunt. The child took a different route from her aunt's house and was found wondering on State Route 125. A concerned motorist pulled over, called the police, and stayed with the child until officers arrived. Mother was charged with and convicted of child endangering.

{¶ 20} The conditions in Grandparents' home were also deteriorating. The floors had more stains, the house was in general disarray, appliances were broken, tile floors were sticky, and laundry was scattered in multiple places. The children themselves were also continually dirty. Grandfather hit the oldest child with a belt that left red welts on her leg, and Grandmother and Mother were involved in physical altercations such as Grandmother hitting Mother with a hairbrush and pushing her. Grandparents "evicted" Mother at one point, but Mother did not leave the home.

{¶ 21} In May 2012, the agency moved the court for temporary custody of the children. The agency cited Mother's child endangering conviction. The agency also noted another incident where police were called because the children came home from school and could not get into their home because Mother was asleep inside. The children tried to walk to their aunt's house, and no one could find the children for over 20 minutes. The juvenile court held a hearing and ordered that the agency have temporary custody of the children, and the children were placed in foster care.

{¶ 22} The children exhibited "out-of-control" behavior at the foster homes. The youngest child defecated on the floor and smeared feces on the walls. The middle child ran away from the foster parent at the store, would attempt to jump from the moving car, and would kick the beds, walls, doors, as well as the foster parents themselves. The oldest child continued to exhibit anger, and was physically harming her two siblings. On one occasion,

the foster parents were forced to call the police when the oldest child slammed the youngest child's arm in the door and would not calm down. The oldest child was taken to Children's Hospital for inpatient psychiatric services. The foster family asked that the children have different placement.

{¶ 23} At the new foster home, the oldest child continued to have episodes. One such episode resulted in the child being taken to Kettering Medical Center where she was placed in the psychiatric ward. There, she stated that she "hated" her sisters and did not want to live with them anymore. The oldest child was released from the hospital and moved to a different foster home, where she no longer lived with her sisters. The middle and younger child continued to live together at the second foster home, until they were later reunified with the oldest child in a third foster home. The children are doing well in the foster home, and call the foster parents "Mom" and "Dad." While the foster parents report that the children have "melt downs" on occasion, the triggering event for the behavioral issues is visiting with or talking about Mother. The children have made friends in the neighborhood and are respecting their boundaries. The children are enjoying school, and have also addressed some of their physical and mental health issues.

{¶ 24} The two older children entered foster care overweight and with unhealthy cholesterol levels. Once in foster care, their weight has decreased once they were offered a healthy diet and exercise options. However, during Mother and Grandmother's visits with the children, Mother brought each child their own box of chicken nuggets, a cheeseburger, french fries, chocolate milk, pop, ice cream, and brownies. On another visit, Mother and Grandmother brought the children large pizzas and cupcakes, and promised the children that they could each eat two cupcakes on the next visit when one child complained that she wanted more cupcakes. During the visits, Mother typically engages with the children when she knows that she is being observed by the GAL or agency workers, but does not engage

when the workers are not in plain sight. The children enjoy seeing Grandmother at the visits and sit on her lap and give her hugs.

{¶ 25} Grandparents moved the court for permission to intervene, and moved for legal custody of the children. Grandparents told the court that they were in the process of making Mother leave their home, as they believed that she was incapable of caring for the children. The magistrate held a hearing, and later issued findings of fact and conclusions of law, denying Grandparents' motion for legal custody of the children. Grandparents objected to the magistrate's decision, arguing that the findings and conclusions were too general. The juvenile court overruled the objections, and adopted the magistrate's decision. Grandparents now appeal the juvenile court's decision, raising the following assignments of error, which we will combine for ease of discussion.

{¶ 26} Assignment of Error No. 1:

{¶ 27} THE TRIAL COURT ERRED AS A MATTER OF LAW BY FAILING TO MAKE SUFFICIENT FINDINGS OF FACT AND CONCLUSIONS OF LAW AS THE BASIS FOR ITS CUSTODY DECISION.

{¶ 28} Assignment of Error No. 2:

{¶ 29} THE JUDGMENT OF THE TRIAL COURT IS CONTRARY TO LAW BECAUSE IT IS BASED ON INSUFFICIENT EVIDENCE TO SHOW THAT IT WAS IN THE CHILDREN'S BEST INTEREST TO REMAIN IN THE TEMPORARY CUSTODY OF CLERMONT COUNTY CHILDREN'S PROTECTIVE SERVICES.

{¶ 30} Assignment of Error No. 3:

{¶ 31} THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANTS' MOTION FOR LEGAL CUSTODY OF THEIR GRANDCHILDREN BECAUSE A PREPONDERANCE OF THE EVIDENCE DEMONSTRATED THAT GRANTING LEGAL CUSTODY TO APPELLANTS WAS IN THE BEST INTERESTS OF THE CHILDREN.

{¶ 32} Grandparents argue in their assignments of error that the juvenile court abused its discretion by denying their motion for legal custody of the children.

{¶ 33} A reviewing court will not reverse a juvenile court's custody decision absent an abuse of discretion. *In re A. C.,* 12th Dist. Butler No. CA2006-12-105, 2007-Ohio-3350. An abuse of discretion constitutes more than an error of law or judgment; it requires a finding that the trial court acted unreasonably, arbitrarily or unconscionably. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219 (1983). The discretion granted to a juvenile court in custody matters "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re A. W.-G.,* 12th Dist. Butler No. CA2003-04-099, 2004-Ohio-2298, ¶ 6, citing *Miller v. Miller,* 37 Ohio St.3d 71, 74 (1988). Thus, an appellate court affords deference to a judge or magistrate's findings regarding witnesses' credibility. *In re D.R.,* 12th Dist. Butler Nos. CA2005-06-150, CA2005-06-151, 2006-Ohio-340, ¶ 12.

{¶ 34} It is well-established that relatives seeking custody of a child are not afforded the same presumptive rights that a natural parent receives. *In re A.C.,* 2007-Ohio-3350. A juvenile court is not required to find by clear and convincing evidence that a relative is an unsuitable placement option. *In re Patterson,* 134 Ohio App.3d 119, 130 (9th Dist.1999). When a grandparent seeks legal custody, the inquiry focuses on what is in the best interest of the child. *In re A.C.,* 2007-Ohio-3350. "While 'blood relationship' and 'family unity' are factors to consider when determining a child's best interest, neither one is controlling."[1] *In re S.K.G.,* 12th Dist. Clermont No. CA2008-11-105, 2009-Ohio-4673, ¶ 12. Instead, the factors a court should consider when determining the best interest of a child are codified in R.C.

---

1. According to R.C. 2151.412(H)(2), when developing a case plan, a child services agency should try and place the child with a suitable relative upon the determination that the child's parents cannot or should not be caring for the child. However and as previously stated, Grandparents failed the home study and were therefore not a suitable placement for the children.

3109.04(F)(1), and include,

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; * * *

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶ 35} The preferred method for addressing the statutory factors is for the magistrate/juvenile court/domestic relations court to address the facts as they relate to the corresponding statutory factors. The majority of juvenile courts and domestic relations courts within this district properly issue written decisions that clearly list the specific factors set forth in R.C. 3109.04(F) and then discuss the pertinent facts as they relate to the factors before

- 11 -

moving on and addressing the next factor. The reason this method is preferred, and the reason pertinent rules require a court to issue findings of fact and conclusions of law, is so that this court can perform a meaningful review of the basis for the trial court's decision. *Lehman v. Lehman*, 12th Dist. Brown. No. CA89-09-014, 1990 WL 40626 (Apr. 9, 1990). Moreover, and as this court has noted, findings and conclusions "aid the appellate court in reviewing the record * * *." *Valentine v. Valentine,* 12th Dist. Butler App. No. CA2004-01-024, 2005-Ohio-2366, ¶ 31. However, "when there is no evidence to the contrary, an appellate court will presume that the trial court considered all the relevant factors." *Evans v. Evans*, 106 Ohio App.3d 673, 677 (12th Dist.1995).

{¶ 36} The magistrate's decision did not follow the preferred format, and instead, was more general in nature. According to both Juv.R. 40(D)(3)(a)(ii) and Civ.R. 53(D)(3)(a)(ii), "a magistrate's decision may be general unless findings of fact and conclusions of law are timely requested by a party or otherwise required by law. A request for findings of fact and conclusions of law shall be made before the entry of a magistrate's decision or within seven days after the filing of a magistrate's decision." The record is clear that Grandparents made a motion for findings of fact and conclusions, of law. However, they did not do so until December 26, 2012, where the magistrate's decision was issued on December 12, 2012. The motion was therefore untimely made, and the court was permitted to issue a general decision. However, the findings and conclusions were not so general that, as Grandparents argue, this court was not able to make a meaningful review.

{¶ 37} This court has reversed decisions of the trial court when such decisions require us to invoke our own judgment, rather than review the trial court's decision for an abuse of discretion. For example, we reversed the decision of the trial court terminating an agreed parenting plan and establishing a shared parenting plan where the trial court's decision lacked a clear indication of whether it properly considered evidence or statutory precepts.

*Preece v. Stern*, 12th Dist. Madison Nos. CA2008-09-024, CA2008-12-029, 2009-Ohio-2519,

¶ 14. We stated,

> given the deference we are to afford the trial court, its written opinion takes on additional significance because through it, the trial court provides us with the information and reasoning it deemed integral when determining custody matters.  However, when that analysis and clear reasoning is absent from the trial court's written opinion, it is impossible to review the decision without supplanting the trial court's judgment with our own.  As doing so is not permitted in an abuse of discretion review, we are forced to ask the trial court to clearly enumerate its reasoning and to follow statutory precepts before we can review its decision to revoke the agreed entry and establish shared parenting.

{¶ 38} However, the concerns we expressed in *Preece v. Stern* are absent in this case.  The magistrate's decision entitled "Findings of Fact, Conclusions of Law, Decision of Magistrate," sets forth the evidence the magistrate relied upon when balancing the R.C. 3109.04 factors, and when making its decision to deny Grandparents' custody motion.  We agree with Grandparents that the magistrate's organization and form were less than desirable.  However, and unlike a situation where this court is unable to affect a review of the trial court's decision, we are able to review the juvenile court's decision without supplanting our judgment for that of the juvenile court.

{¶ 39} First, the magistrate set forth the pertinent facts that formed the procedural basis of the cause of action, including the history of how the children became involved with the agency, how Mother lost custody of the children temporarily, and the motions that had been filed since that time.  The decision next sets forth the pertinent evidence the magistrate considered when balancing the factors.  While Grandparents argue that the evidence is merely summary without stating what degree of credibility was assigned to the testimony, the magistrate only included the testimony it determined was relevant to the balancing of factors, thus supporting the requisite findings of fact.  This is not a situation where the magistrate made blind reference to the record without otherwise narrowing down the pertinent evidence

or important testimony. Instead, the magistrate summarized pivotal testimony and did so in a manner that allows this court to understand what evidence out of the nearly three years of procedure the magistrate considered when balancing the statutory factors.

{¶ 40} It is important to note that much of the testimony regarding important issues, such as Grandmother's health issues, was undisputed. Therefore, and unlike a custody determination contingent upon the credibility of witnesses, the evidence in this case simply required the requisite balancing. Even so, the magistrate's findings of fact and conclusions of law indicate a full consideration of the R.C. 3109.04 factors, and has provided the necessary basis for appellate review. We would also note that the magistrate's findings of fact and conclusions of law were clear enough that Grandparents addressed the magistrate's findings and conclusions under each pertinent statutory factor in their brief when arguing that it was in the best interest of the children to grant the custody motion. This court is also able to understand what evidence is pertinent to each factor, even absent a magistrate's decision that adheres to the preferred practice. Therefore, we will next analyze whether denying Grandparents' custody motion was in the best interests of the children, and return to the factors listed in R.C. 3109.04(F)(1).

{¶ 41} Regarding the wishes of the children's parents concerning the children's care, the court considered that Mother was in support of Grandparents having custody if she could not. The court did not interview the children in camera.

{¶ 42} Regarding the children's interaction and interrelationship with the parents, siblings, and any other person who may significantly affect the children's best interest, the court heard evidence and considered that the children are bonded with Grandmother, as she has provided care even when the children were in Mother's custody. However, the children have also formed a good relationship with the foster parents, calling them "Mom" and "Dad."

{¶ 43} The court also considered evidence that the children are negatively impacted

by association with Mother, including regressing in health and behavior whenever they are returned to her custody. This becomes important because the record indicates that Grandparents have continually allowed Mother to live with them so that Mother would be in contact with the children if they were placed in Grandparents' custody. Although there was testimony that Mother has "officially" moved out of Grandparents' home, the magistrate specially noted that Grandfather makes the decisions in the home and that he and Mother have a "very strong bond that supersedes" the children. Grandmother also testified that she and Grandfather agree that Mother is an adult and should be self-sufficient but that it is difficult for Grandfather to turn Mother away when Mother is unemployed, claims she cannot work because of physical ailments, and has been turned down when seeking housing assistance because of her criminal history. Grandmother testified that Mother had even been turned away from homeless shelters because of her history, and now lives in an old trailer somewhere.

{¶ 44} The juvenile court considered the children's adjustment to home, school, and community, and the evidence that the children have been subjected to considerable upheaval in their young lives. The record indicates that the children were doing well in the first foster home in which they were placed, but then regressed when they were placed back with Mother. The children have had a difficult time adjusting to their homes, schools, and communities and have continually acted out. The oldest and middle child have had histories of getting into trouble at school and day-care, and often caused distractions or incurred negative attention. While Grandparents argue that they could do a better job of allowing proper adjustment for the children, the record indicates otherwise. The home study Grandparents failed brought to light multiple concerns regarding their ability to parent the children, and the children had not advanced under Grandparents' care.

{¶ 45} The court also considered the mental and physical health of all persons

involved in the situation. The record is undisputed that Grandmother has health problems that limit her ability to care for the children. The court heard evidence that Grandmother receives Social Security disability payments because of arthritis in her knees, hips, and spine, as well as depression. Grandmother takes prescriptions for migraines and one for her "nerves." Grandmother uses a motorized wheelchair when she goes shopping and cannot walk for long periods of time. These health care issues are especially disconcerting given that the children are young, need constant supervision, and have been described as "high energy."

{¶ 46} The record also indicates that Mother continues to have mental health issues, as well as physical issues that required her to take several prescriptions per day. Again, this causes concern given Grandparents' proclivity to allow Mother to live in their home and have unfettered access to the children.

{¶ 47} While neither Grandparent has been convicted of criminal offenses that have resulted in the children being adjudicated abused or neglected, they have had a history of allowing Mother to live in their home while the children are there. As previously stated, Mother had been convicted of multiple counts of child endangering, and the children were adjudicated dependent.

{¶ 48} The court did not hear any evidence regarding facilitation of parenting time, failure to make child support payments, or whether Grandparents are planning to establish a residency outside of Ohio.

{¶ 49} After considering the evidence and the manner in which the juvenile court balanced the best interest factors, we do not find that the juvenile court abused its discretion in denying Grandparents' motion for custody. As such, Grandparents' three assignments of error are overruled.

{¶ 50} Judgment affirmed.

S. POWELL, P.J., and M. POWELL, JJ., concur.