[Cite as *In re E.S.K.*, 2019-Ohio-1588.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| E.S.K. | : | CASE NO. CA2018-07-053 |
| | : | O P I N I O N<br>4/29/2019 |


APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2016 JC 04876


D. Vincent Faris, Clermont County Prosecuting Attorney, Nick Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellee

Morris Law Office, LLC, Timothy J. Morris, 60 North Second Street, Batavia, Ohio 45103, for appellant

R. Aaron Maus, 10 South Third Street, Batavia, Ohio 45103, for mother

Zachary Faris, 40 South Third Street, Batavia, Ohio 45103, guardian ad litem for mother

Barbara Haumesser, 2400 Clermont Center Drive, #204A, Batavia, Ohio 45103, guardian ad litem for E.S.K.


**HENDRICKSON, P.J.**

{¶ 1} Appellant, the maternal grandmother ("Grandmother") of E.S.K., appeals a decision of the Clermont County Court of Common Pleas, Juvenile Division, denying her complaint and motion for legal custody and immediate placement of the child.

{¶ 2} E.S.K. was born on July 4, 2016, approximately six weeks premature, to

Grandmother's daughter ("Mother"), who is cognitively delayed.[1] Mother, who resided with Grandmother, kept her pregnancy a secret until she went into labor. Mother had not purchased anything in preparation for E.S.K.'s birth. Although the child was ready to be discharged from the hospital on July 12, 2016, E.S.K. could not be released because Mother did not have a crib, car seat, diapers, bottles, or formula and had no plan to obtain such items. Grandmother also had not obtained the items, as she had not originally known about the baby and had not had time to prepare for E.S.K.'s arrival.

{¶ 3} On July 13, 2016, in Clermont County Juvenile Court Case No. 2016 JG 23028, Grandmother filed a complaint for custody of E.S.K. The following day, in Clermont County Juvenile Court Case No. 2016 JC 04876, appellee, the Children's Services Division of the Clermont County Department of Job and Family Services ("the agency"), filed a complaint alleging that E.S.K. was a dependent child and asking for temporary custody. The juvenile court granted temporary custody of E.S.K. to the agency, and E.S.K. was placed in foster care. A guardian ad litem ("GAL") was appointed for E.S.K. Subsequently, on July 28, 2016, following an admission by Mother, E.S.K. was found to be a dependent child. That same date, Grandmother filed a motion for temporary custody or immediate placement of E.S.K. in Case No. 2016 JC 04876. The juvenile court eventually consolidated the two cases.

{¶ 4} At a September 6, 2016 disposition hearing, E.S.K. was ordered to remain in the temporary custody of the agency. At this time, a caseworker for the agency provided an update of the agency's pursuit of a home study for Grandmother's residence. The caseworker noted that the home study could not go forward until Mother moved out of Grandmother's residence as E.S.K. could not be placed in a home with Mother. At an October 13, 2016 review hearing, a caseworker for the agency noted that Grandmother's

---

1. The father of E.S.K. was originally unknown. Genetic testing of E.S.K. revealed that the child was born of an incestuous relationship between Mother and her father.

parents, E.S.K.'s great-grandparents ("Great-Grandparents"), had filed for a home study and that Grandmother's home study had not yet been completed as Mother continued to reside in the home with Grandmother.

{¶ 5} On February 17, 2017 and February 28, 2017, a magistrate held a hearing on Grandmother's complaint for custody and motion for temporary custody or immediate placement. At the hearing, Grandmother testified she was 60 years old and was employed as a home health aide making $9.00 an hour. Grandmother had worked as a home health aide for 20 years, and prior to that, she worked in a daycare for six years and as a nanny for two-to-four years. Grandmother had been trained in CPR and first aid care. In order to provide for E.S.K.'s needs, Grandmother testified she was willing to continue working and, if necessary, obtain a second job.

{¶ 6} Grandmother stated she had been living with Great-Grandparents in their home in Batavia, Ohio since November 2016. Prior to moving in with Great-Grandparents, for nearly 15 years, Grandmother lived in a two-bedroom condominium in Cincinnati, Ohio that she rented from Great-Grandparents. Grandmother paid Great-Grandparents $265 a month for rent and utilities, and Grandmother permitted Mother to live in the condominium with her. Grandmother testified that it was her understanding that the condominium would be willed to her upon Great-Grandparents' deaths. Grandmother believes she will be able to afford the utilities and taxes on the condominium when her parents pass.

{¶ 7} Grandmother explained she moved out of the condominium and in with Great-Grandparents to satisfy the agency's requirement that she live separate from Mother. However, Grandmother testified that the long-term plan was for Mother to find a place of her own to reside and for Grandmother to move back into the condominium. Grandmother admitted she spends one night a week with Mother at the condominium so that she and Mother can attend church services together on Sundays.

- 3 -

{¶ 8} With respect to E.S.K.'s birth, Grandmother testified she found out about Mother's pregnancy on the same day E.S.K. was born. Mother had not told Grandmother about the pregnancy and hid it behind baggy clothes. Because she had not known about the pregnancy and was ill around the time of the child's birth, Grandmother had not been able to prepare for E.S.K.'s arrival. However, Grandmother visited the child daily at the hospital. After E.S.K. was released from the hospital and placed in the agency's temporary custody, Grandmother had weekly visitation with the child. Grandmother had not missed a single visit with E.S.K., and during her visits with the child, Grandmother would take pictures and videos of E.S.K., help feed E.S.K., play with E.S.K, and kiss and hug E.S.K.

{¶ 9} Grandmother testified about issues the agency had with her during her visits with E.S.K. As to the agency's complaint that she did not properly support E.S.K.'s head during visits, Grandmother stated she knew how to properly hold an infant. Grandmother testified about an instance where E.S.K. reared back while Grandmother was holding her. Grandmother explained that she had to lift her arm up to catch E.S.K.'s head and neck. As for the agency's concerns that Grandmother was too emotional, Grandmother admitted that she sometimes became emotional during her visits with E.S.K. Grandmother testified the visits were emotionally difficult as she was only permitted to see E.S.K. for a short period of time each week and those visits were monitored and occurred at a visitation center. Grandmother admitted to leaving the visitation room on one occasion but denied that she left because she could not handle E.S.K.'s crying. Grandmother stated that another parent visiting his or her children had started crying, which upset Grandmother.

{¶ 10} Grandmother testified she attended parenting classes with Mother and made childcare arrangements for E.S.K. Grandmother explained that if she were granted custody, Great-Grandparents, who were in their 80s, would watch E.S.K. while Grandmother worked. If Great-Grandparents were unavailable to care for E.S.K., the child would be placed in a

nearby daycare. Grandmother had contacted the daycare, and the daycare indicated there was an opening to take E.S.K. According to Grandmother, the daycare would cost $125 per week for part-time placement and Grandmother believed she could get vouchers to help pay for the expense.

{¶ 11} Mother testified she is in favor of E.S.K. being placed in Grandmother's custody. Mother explained she resided in the condominium owned by Great-Grandparents but intended to find her own apartment. According to Mother, Grandmother spends the night with her at the condominium about once per week.

{¶ 12} A daughter of one of Grandmother's clients testified as to Grandmother's character and abilities as a caretaker. The witness noted that Grandmother had been working as an aide caring for the witness' elderly, invalid father for the past two years. The witness described Grandmother as a very compassionate, patient, and kind individual who had a "wonderful work ethic" and "follow[ed] the rules of her company to the letter."

{¶ 13} Grandmother's brother testified that Grandmother was very kind and loving. He stated that the condominium Grandmother rented from Great-Grandparents was spacious and safe. It was Grandmother's brother's understanding that Grandmother lived at the condominium with Mother, although Grandmother "occasionally" stayed with Great-Grandparents at their residence.

{¶ 14} Great-Grandfather testified that he and his wife intended to will the condominium to Grandmother but had not yet done so. He stated Grandmother was living between Great-Grandparents' home and the condominium she rented, although Grandmother was trying to spend most of her time at her parents' home. Great-Grandfather discussed expenses related to the condominium Grandmother rented from him, noting that there were utilities, monthly condo fees, and semi-annual real estate taxes of about $500.

{¶ 15} E.S.K.'s GAL also briefly testified at the hearing. She stated that while

- 5 -

Grandmother clearly loved E.S.K., she was "not quite sure that [Grandmother] understands everything that needs to be done with the child." The GAL had concerns that it would be "very difficult financially" for Grandmother to care for E.S.K. Nonetheless, the GAL supported Grandmother receiving temporary custody of E.S.K. to see how Grandmother would do caring for E.S.K.

{¶ 16} A home-study accessor from the agency who conducted a home study of Great-Grandparents' residence testified about concerns she had about Grandmother's honesty and ability to directly communicate with the agency. The accessor explained that although Grandmother had indicated she had been living at Great-Grandparents' residence for a few weeks prior to the home study, evidence found in Great-Grandparents' home and statements made by Mother to the agency appeared to contradict Grandmother's claim. The accessor noticed Grandmother's belongings were being stored in Great-Grandparents' laundry room while Great-Grandmother's things were in the storage areas in the room in which Grandmother claimed to be staying. Furthermore, shortly after the accessor completed her walk-through of Great-Grandparents' home, Mother made a statement that she had only recently spent her first night alone in the condominium. Mother's first night alone in the condominium occurred about a month after Grandmother had reported moving out of the residence and into Great-Grandparents' home.

{¶ 17} The accessor also testified about concerns relating to Grandmother's finances and Grandmother's understanding of costs associated with renting or owning a home. The accessor explained that while discussing Grandmother's monthly budget with her, Grandmother indicated she was unaware of any utility bills associated with the condominium. The accessor later discovered that Great-Grandparents pay the utilities for the condominium. Furthermore, with respect to Grandmother's monthly budget, the accessor noted that Grandmother's current budget allowed for a $200 monthly surplus. However, the accessor

felt that this budget was "incomplete" as Grandmother paid well under the fair market rate in rent, did not pay her own utilities, and did not know how much tax and insurance would be associated with the condominium if it was later willed to her by Great-Grandparents.

{¶ 18} The accessor also spoke about concerns the agency had with respect to Grandmother's interactions with E.S.K. The accessor noted she had been present for three or four of Grandmother's visits with E.S.K. and had observed that Grandmother failed to support the child's head when handing E.S.K. to another person. She had also observed that Grandmother could not tolerate E.S.K.'s crying. According to the accessor, "if the child starts to cry and cries more than a few minutes [Grandmother] leaves the visit, she sits in the lobby and sobs."

{¶ 19} A visitation supervisor for the agency also testified about Grandmother's visitations with E.S.K. The supervisor stated that although Grandmother had not missed any visitations with E.S.K., she often arrived late. The supervisor discussed numerous concerns she had with Grandmother's ability to parent E.S.K. She testified Grandmother was the "worst offender" when it came to properly supporting E.S.K.'s head. She also discussed Grandmother's emotional state during the visits, commenting that Grandmother often cried during visits and would leave the visitation room whenever E.S.K. would cry for any length of time. The supervisor testified that during Grandmother's February 15, 2017 visit, Grandmother left E.S.K. alone on a bench in the visiting room so that she could take photographs. This was concerning to the supervisor as there was a possibility that E.S.K. could have fallen off the bench and hurt herself.

{¶ 20} After considering the foregoing testimony and considering the best interest factors set forth in R.C. 3109.04(F), the magistrate issued a decision denying Grandmother's complaint for custody and motion for temporary custody or immediate placement. Grandmother filed objections to the magistrate's decision and, at the objection hearing,

sought to introduce video evidence of the February 15, 2017 visitation. Grandmother argued the evidence was not available for review before or at the hearing before the magistrate as the machine used to create and view the recording had been broken. However, subsequent to the hearing, E.S.K.'s GAL had been able to obtain a copy of the recorded visitation and had indicated the recording contradicted the visitation supervisor's testimony that Grandmother left E.S.K. alone on a bench.

{¶ 21} The juvenile court granted Grandmother's request to take additional evidence, finding that the recording was "newly discovered evidence that should be considered by the Magistrate in reaching a decision on * * * Grandmother's motion for custody." The court further found that a mental health evaluation of Grandmother would be beneficial in determining Grandmother's ability to care for E.S.K., and the court directed Grandmother to make arrangements with the agency for an evaluation. The court then remanded the matter to the magistrate for a hearing on these issues.

{¶ 22} Grandmother and the agency agreed that Dr. Barbara Brewer, a licensed psychologist, would complete Grandmother's mental health evaluation. Brewer met with Grandmother on three occasions and submitted a report to the court. Brewer also testified at the remand hearing, held on November 9, 2017. She explained that before evaluating Grandmother, she obtained background information about the custody case from Grandmother's attorney and the agency. Brewer also reviewed court documents, GAL reports, the agency's home-study report of Great-Grandparents' residence, the agency's activity reports from Grandmother's visitations with the child, and other "documents from [the] agency voicing their concerns."

{¶ 23} Brewer's first meeting with Grandmother took place on August 22, 2017. At this time, Grandmother took the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") test to screen out psychopathology and personality traits. According to Brewer, when taking the

MMPI-2 test, Grandmother attempted to present herself in a very positive light and did not acknowledge her shortcomings. Brewer noted that this was not surprising, given that Grandmother had a strong motivation to present herself in the best light possible as she wanted to obtain custody of E.S.K.

{¶ 24} Brewer's second meeting with Grandmother occurred on August 29, 2017, when Brewer spoke with Grandmother for approximately an hour. Brewer testified that during this meeting, Grandmother got "very teary" when discussing the situation with E.S.K. However, Brewer did not observe Grandmother sobbing or having emotional outbursts, as described by the agency in its reports.

{¶ 25} During Brewer's third meeting with Grandmother, which occurred on September 9, 2017, Brewer tested Grandmother's cognitive functioning by administering a brief IQ test and a mini mental status exam. With respect to the latter test, Brewer testified the exam indicated Grandmother did not have any short-term memory problems. However, Brewer was concerned when Grandmother stated she was unable to "subtract 7s from 100" as she was "terrible at math." Brewer was also troubled by the fact that though Grandmother has a bank account, she did not seem to understand how checks worked.

{¶ 26} As for the IQ test, Brewer stated she used the Wechsler Abbreviated Scale of Intelligence ("WASI-II"). The test revealed an estimated IQ in the 80s, which caused Brewer to opine that Grandmother has "mild difficulties." Brewer explained that while Grandmother had "some deficits in a more higher level of conceptional thinking," her lower IQ would not "interfere with sort of the normal activities of daily living." Nonetheless, Brewer had concerns that Grandmother's inability to think on a more conceptual level may affect her ability to understand proper child development. For example, Brewer noted that Grandmother had made an unusual comment about E.S.K. being an early walker after Grandmother allegedly saw two-month-old E.S.K. scoot in an incubator. According to Grandmother, E.S.K.'s

scooting was an indication that E.S.K. would be an early walker.

**{¶ 27}** While the mild difficulties associated with Grandmother's lower IQ was a factor Brewer took into consideration in forming her opinion as to whether Grandmother should obtain custody of E.S.K., Brewer testified that she "gave more weight to [Grandmother's] emotional volatility."  Although she had not personally observed Grandmother act emotionally inappropriately during the three interviews she had with Grandmother, Brewer had read the agency's reports of Grandmother's emotional instability during visitations.  Brewer noted Grandmother had admitted she had a tendency to cry easily and had "gotten teary" and cried a little in each of their three meetings.  Grandmother also indicated she worked under a great deal of stress and did not sleep well.

**{¶ 28}** As a result of her observations, Grandmother's admissions, and the agency's reports, Brewer felt Grandmother overestimated what she could handle when it came to caring for E.S.K. and "under estimate[ed] the stress and all that could happen here."  Brewer noted that while Grandmother raised Mother, she did so only with a significant amount of financial and emotional support from Great-Grandparents, who are now in their 80s. Brewer questioned whether Grandmother would be able to handle the stress of raising a teenage girl when Grandmother was in her 70s.  Brewer ultimately opined that E.S.K. should stay in the care of her foster parents with arrangements made to allow Grandmother more contact with the child.  However, after Brewer admitted that her opinion was formed without having viewed Grandmother's interactions with E.S.K. and that such observation would be helpful, the magistrate agreed to continue the hearing to a later date to allow Brewer time to watch videos of Grandmother's visitations with E.S.K. and to personally attend a visitation.

**{¶ 29}** Before adjourning for the day, the magistrate viewed the "newly discovered" recording of the February 15, 2017 visitation.  The recording contradicted the visitation supervisor's testimony about Grandmother leaving E.S.K. alone on the bench.  The

magistrate, therefore, indicated he would "totally disregard the earlier testimony" of the visitation supervisor.

{¶ 30} The hearing continued on January 30, 2018. At this time Brewer testified she had attended a one-hour visitation between Grandmother and E.S.K. and had viewed recordings of Grandmother's prior visitations with the child. Brewer testified Grandmother was "perfectly appropriate" in the recorded visitations and in the visitation Brewer personally observed. Brewer observed that E.S.K. was "quite comfortable" with Grandmother, indicating when she wanted to be picked up, allowing Grandmother to change her diaper, and seeking comfort from Grandmother after pinching her finger. Brewer testified she had "no concerns whatsoever about * * * [Grandmother] taking care of [E.S.K.] on * * * regular, day-to-day kinds of interactions."

{¶ 31} However, since the November 9, 2017 hearing date, Brewer had received new information relating to medical issues E.S.K. had recently been diagnosed with and these medical issues caused Brewer concern about whether Grandmother could properly care for the child. Brewer spent an hour talking to E.S.K.'s foster mother and was advised by the foster mother that E.S.K. had been diagnosed with a genetic disorder known as alpha-1 antitrypsin deficiency. Brewer testified that it was her understanding, from talking with E.S.K.'s foster mother, that with this genetic disorder, "the liver creates a protein, goes into the bloodstream, coats the lungs and intestinal tract. * * * [I]t can involve, over time, serious liver or lung issues." Brewer had been informed by E.S.K.'s foster mother that E.S.K.'s hemoglobin was low, her liver enzymes elevated, and that E.S.K. had started seeing an endocrinologist for her health needs. E.S.K.'s foster mother had also reported to Brewer that E.S.K. had severe issues involving gaining weight and growing and, at one point, was "borderline failure to thrive." E.S.K. started seeing a dietician and foster mother began monitoring E.S.K.'s vitamin absorption and food intake to ensure E.S.K. obtained the

necessary calories and gained weight.

{¶ 32} In addition to the alpha-1 antitrypsin deficiency, Brewer was informed that E.S.K. suffered from oral motor delay and a lazy eye that would likely require surgery. Given E.S.K.'s medical problems and Grandmother's "mild intellectual difficulties," Brewer testified that she had concerns about whether Grandmother would take E.S.K.'s medical issues seriously and whether Grandmother would be "able to follow through and really fully understand and be able to handle all of the many medical appointments."[2]

{¶ 33} Brewer admitted that her only information about E.S.K.'s medical issues and treatment needs came from a conversation with E.S.K.'s foster mother. Brewer had not looked over E.S.K.'s medical records. She also did not know what type of communication, if any, had occurred between the agency and Grandmother regarding E.S.K.'s medical status.

{¶ 34} Brewer indicated that her concerns about Grandmother not being able to care for E.S.K.'s medical needs were "more of a generalized concern" and she could not point to a specific instance in Grandmother's life to support her concern. Nonetheless, Brewer was of the opinion that Grandmother could not adequately care for E.S.K.'s medical needs as Grandmother's "cognitive deficits, though mild [were] sufficient to raise concerns about her ability to fully understand [E.S.K.'s] disorders and follow through appropriately."

{¶ 35} Following Brewer's testimony, Grandmother's counsel asked that the hearing be continued so that additional evidence, and perhaps a second opinion, could be obtained regarding Grandmother's ability to care for E.S.K. given E.S.K.'s recent diagnosis of alpha-1 antitrypsin deficiency. Grandmother's counsel stated:

> I'd like to, you know, fully understand what the, what the
> diagnosis is and what the ramifications of the disorder is today,
> what the possibilities are at six months or in the future. And what

---

2. Brewer had given Grandmother an additional cognitive thinking test after the November 9, 2017 hearing date, and this test indicated Grandmother's IQ was between 77 and 82. This test, therefore, was consistent with the results of the WASI-II test.

that, what that entails. [Brewer's] made a, she's made a tremendous leap from, "I have general concerns" to "[Grandmother] won't be able to follow through on instructions." I don't know. I have not talked to the doctor. I have not been given authorization to get the medical records. And [Brewer's] analysis that [Grandmother] wouldn't be able to follow through on whatever the disorder is, I don't know what that is and I would like to submit additional evidence to figure out what, what this child's disorder entails.

{¶ 36} The magistrate denied Grandmother's counsel's request to continue the hearing, stating that his instructions on remand were limited to viewing the February 15, 2017 recording and taking evidence regarding the results of Grandmother's mental health evaluation. Thereafter, the magistrate rendered a decision in which it once again found that custody and placement of E.S.K. in Grandmother's care was not in E.S.K.'s best interest. In so holding, the magistrate relied on E.S.K.'s recent medical diagnosis, noting that Grandmother "does not appear to be currently capable of handling the immense day to day responsibilities of being the primary caretaker for the young child in the situation which confronts the Court. Particularly a child with a genetic medical condition." The magistrate therefore denied Grandmother's complaint for custody and motion for temporary custody or immediate placement and continued temporary custody of E.S.K. with the agency.

{¶ 37} Grandmother filed objections to the magistrate's decision, essentially arguing that the evidence did not support the magistrate's decision to deny her complaint and motion for custody. Grandmother argued that Brewer speculated she could not handle the day-to-day frustrations of caring for E.S.K. and that there was no "specific evidence" that she was not able to fully understand or handle E.S.K.'s medical issues or appointments. Following a hearing on Grandmother's objections, the juvenile court issued a decision in which it overruled Grandmother's objections and adopted the magistrate's decision. In doing so, the juvenile court discussed E.S.K.'s medical issues and noted that it was "concerned about the [G]randmother having the foresight to make sure the child has the benefit of preventative

medicine, medical care and the proper diet." The court also stated it was "convinced that the [G]randmother may never be able to see beyond the child's immediate needs, much less plan for those future needs through proper nutrition, diagnosis, and preventive treatment."

{¶ 38} Grandmother timely appealed the juvenile court's decision denying her complaint and motion for legal custody and immediate placement of the child, raising the following as her only assignment of error:

{¶ 39} THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN DENYING APPELLANT'S REQUEST AND COMPLAINT FOR CUS[T]ODY AND PLACEMENT FOR E.S.K.

{¶ 40} In her sole assignment of error, Grandmother argues that the juvenile court erred when it denied her request to be named E.S.K.'s legal custodian as the evidence demonstrated it was in E.S.K.'s best interest for Grandmother to be granted custody. Grandmother contends that in denying her complaint and motion for custody, the juvenile court relied on false and misleading testimony from the agency and from Brewer. Finally, Grandmother contends the juvenile court erred when it relied on hearsay testimony regarding E.S.K.'s medical issues as "[t]here was no concrete, reliable evidence to support that [E.S.K.] has a medical issue, the severity of that issue, the overall health of the child, and the specific future needs of the child."

{¶ 41} A reviewing court will not reverse a juvenile court's custody decision absent an abuse of discretion. *In re A.C.*, 12th Dist. Clermont No. CA2006-12-105, 2007-Ohio-3350, ¶ 15. An abuse of discretion constitutes more than an error of law or judgment; it requires a finding that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "The discretion granted to a juvenile court in custody matters 'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In*

- 14 -

*re A.C.* at ¶ 15, quoting *In re A.W.-G.*, 12th Dist. Butler No. CA2003-04-099, 2004-Ohio-2298, ¶ 6.

{¶ 42} "It is well-established that relatives seeking custody of a child are not afforded the same presumptive rights that a natural parent receives." *In re A.B.*, 12th Dist. Clermont No. CA2013-03-024, 2013-Ohio-3405, ¶ 34. A juvenile court is not required to find by clear and convincing evidence that a relative is an unsuitable placement option; rather, when a grandparent seeks legal custody, the inquiry focuses on what is in the best interest of the child. *Id.* at ¶ 34. "[W]hile 'blood relationship' and 'family unity' are factors to consider when determining a child's best interest, neither one is controlling." *In re S.K.G.*, 12th Dist. Clermont No. CA2008-11-105, 2009-Ohio-4673, ¶ 12. Instead, the factors that a court should consider when determining the best interest of a child are codified in R.C. 3109.04(F)(1) and include, but are not limited to: (1) the wishes of the child's parents; (2) the child's wishes, as expressed to the court in chambers; (3) the child's interactions and interrelationships with parents, siblings, and other persons who may significantly affect the child's best interests; (4) the child's adjustment to home, school, and community; (5) the mental and physical health of all persons involved in the situation; (6) the parent more likely to honor and facilitate visitation; (7) whether one parent has denied the other of parenting time; (8) whether child support orders have been followed; and (9) whether either parent has established or is planning to establish a residence outside of Ohio. R.C. 3109.04(F)(1)(a)-(j)

{¶ 43} In the present case, the magistrate and juvenile court both referenced and discussed the best interest factors set forth in R.C 3109.04(F)(1) in denying Grandmother's complaint and motion for custody of E.S.K. In doing so, both the magistrate and juvenile court discussed E.S.K.'s recent diagnosis of alpha-1 antitrypsin deficiency and concerns about Grandmother's ability to care for E.S.K. given the medical issues associated with the genetic disorder. The evidence related to E.S.K.'s medical issues was developed on January

30, 2018, at the last hearing date on Grandmother's complaint and motion, and the evidence was derived from testimony by Brewer – who had obtained the information after speaking with E.S.K.'s foster mother. Grandmother did not object to Brewer's testimony regarding E.S.K.'s medical issues at the hearing or when filing her objections to the magistrate's decision. Instead, Grandmother argues for the first time on appeal that Brewer's testimony regarding E.S.K.'s medical issues was based on impermissible hearsay evidence.

{¶ 44} Pursuant to Civ.R. 53(D)(3)(b)(ii), "[a]n objection to a magistrate's decision shall be specific and state with particularity all grounds for objection." Where a party has failed to object to a factual finding or legal conclusion in accordance with Civ.R. 53(D)(3)(b), "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated a finding of fact or conclusion of law[.]" Civ.R. 53(D)(3)(b)(iv).

{¶ 45} The Ohio Supreme Court has articulated the civil plain error standard as follows:

> reviewing courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings.

*Goldfuss v. Davidson*, 79 Ohio St. 3d 116, 121 (1997). Thus, "for a court to find plain error in a civil case, an appellant must establish (1) a deviation from a legal rule, (2) that the error was obvious, and (3) that the error affected the basic fairness, integrity, or public reputation of the judicial process and therefore challenged the legitimacy of the underlying judicial process." *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, ¶ 40, citing *Goldfuss* at the syllabus.

{¶ 46} In the present case, there was a violation of the hearsay rule. Pursuant to

- 16 -

Evid.R. 801(C), hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Generally, hearsay testimony is inadmissible unless the testimony falls within one of the recognized exceptions. Evid.R. 802; *A N Bros. Corp v. Total Quality, LLC*, 12th Dist. Clermont No. CA2015-02-021, 2016-Ohio-549, ¶ 75. Here, the medical testimony concerning E.S.K. resulted from double hearsay. Brewer testified about information she obtained from E.S.K.'s foster mother, who had obtained the information from E.S.K.'s medical providers. Brewer conceded she had no independent knowledge of E.S.K.'s medical condition and that she had not reviewed any medical records pertaining to E.S.K. Furthermore, none of E.S.K.'s medical records were introduced as an exhibit at trial.[3]

{¶ 47} Brewer's hearsay testimony is particularly concerning in the present case as she was the only witness to testify about the medical issues E.S.K. faced and her testimony came on the final day of the hearing. Brewer indicated that E.S.K.'s diagnosis was recent and that she was "not sure how the communication has worked from Children Services through the [G]randmother, [M]other and [G]reat-[G]randparents so that they fully know what the medical status is." Grandmother's counsel appeared surprised by Brewer's testimony about E.S.K.'s recent medical diagnosis. Counsel asked for a continuance of the hearing so that he could talk to E.S.K.'s doctors and obtain authorization to view her medical records. Counsel indicated that time was needed to "fully understand what the * * * diagnosis is and what the ramifications of the disorder [are] today [and] what the possibilities are at six months

---

3. On February 5, 2018, after the magistrate released its decision following the juvenile court's remand, E.S.K.'s GAL filed a "supplemental report" in which she attached a report of genetic testing completed on E.S.K. In the cover letter attached to the report, the GAL stated the results of the genetic testing indicated that E.S.K. "may have numerous health and medical issues in the future, which are not now known." This report was provided to the juvenile court at the hearing on Grandmother's objections. However, the juvenile court indicated it did not consider the results of this genetic testing in ruling on Grandmother's objections. The court stated, "There was some concern expressed that the needs of the child may be even greater than the testimony outlined at trial. The Court did not take these factors into consideration in rendering this decision."

or in the future."

{¶ 48} Even though Grandmother was not given prior notice of E.S.K.'s medical diagnosis and the difficulties associated with the diagnosis, the magistrate denied counsel's request for a continuance. By allowing Brewer's hearsay medical testimony and denying Grandmother the opportunity to assemble evidence or witnesses to rebut, explain, or otherwise challenge the medical testimony offered at the January 30, 2018 hearing, the juvenile court committed plain error. The basic fairness of the proceeding was affected when Grandmother was denied the opportunity to present evidence important to her request for custody, namely her ability to care for E.S.K. given the recent medical diagnosis of alpha-1 antitrypsin deficiency.

{¶ 49} Accordingly, Grandmother's sole assignment of error is sustained to the extent that the juvenile court committed reversible error in allowing and relying on hearsay testimony of E.S.K.'s recent medical diagnosis. The juvenile court's denial of Grandmother's complaint for custody and motion for temporary custody or immediate placement is hereby reversed, and the matter is remanded for the juvenile court to hold a hearing on the issue of E.S.K.'s medical diagnosis and any issues arising therefrom relative to Grandmother's request for custody. At the hearing, Grandmother shall be permitted to introduce relevant evidence regarding the child's medical issues and her ability to care for the child given those medical issues. The remaining issues presented by Grandmother in her sole assignment of error are hereby rendered moot.

{¶ 50} Judgment reversed and remanded.

RINGLAND and M. POWELL, JJ., concur.