[Cite as *In re E.S.K.*, 2020-Ohio-5568.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| E.S.K. | : | CASE NO. CA2020-06-029 |
| | : | O P I N I O N<br>12/7/2020 |
| | : | |
| | : | |
| | : | |

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2016 JC 04876

D. Vincent Faris, Clermont County Prosecuting Attorney, Nicholas Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellee

Ryan L. DeBra, 4010 Executive Park Drive, Suite 240, Cincinnati, Ohio 45241, for appellant

R. Aaron Maus, 10 South Third Street, Batavia, Ohio 45103, for mother

Zachary Faris, 40 South Third Street, Batavia, Ohio 45103, guardian ad litem for mother

Nathan Bell, 2400 Clermont Center Drive, #204A, Batavia, Ohio 45103, guardian ad litem for E.S.K.

Ben Ellis, 52 Marco Lane, Centerville, Ohio 45458, for father

**HENDRICKSON, P.J.**

{¶1} Appellant, the maternal grandmother ("Grandmother") of E.S.K., appeals a decision of the Clermont County Court of Common Pleas, Juvenile Division, denying her complaint and motion for custody and immediate placement of E.S.K. and granting permanent custody of the child to appellee, the Children's Services Division of the Clermont County Department of Job and Family Services ("the Agency"). For the reasons set forth below, we affirm the juvenile court's decision.

{¶2} E.S.K. was born on July 4, 2016, approximately six weeks premature, to Grandmother's daughter ("Mother"), who is cognitively delayed. The biological father of E.S.K. was originally unknown, but subsequent genetic testing of E.S.K. led to the discovery that E.S.K. was born of an incestuous relationship between Mother and her father ("Father"). Father has since been convicted of sexual battery relating to his relationship with Mother and is imprisoned.

{¶3} Mother resided with Grandmother at the time of E.S.K.'s birth, and she kept her pregnancy a secret until she went into labor. Mother had not purchased anything in preparation for E.S.K.'s birth. When E.S.K. was ready to be released from the hospital on July 12, 2016, E.S.K. could not be released into Mother's care as neither she nor Grandmother had purchased the items necessary for the child.

{¶4} On July 13, 2016, in Clermont County Juvenile Court Case No. 2016 JG 23028, Grandmother filed a complaint for custody of E.S.K. The following day, in Clermont County Juvenile Court Case No. 2016 JC 04876, the Agency filed a complaint alleging that E.S.K. was a dependent child and asking for temporary custody. The juvenile court granted temporary custody of E.S.K. to the Agency and E.S.K. was placed in foster care. A guardian ad litem ("GAL") was appointed for E.S.K. Subsequently, on July 28, 2016, following an admission by Mother, E.S.K. was found to be a dependent child. That same date,

Grandmother filed a motion for temporary custody or immediate placement of E.S.K. in Case No. 2016 JC 04876, The juvenile court eventually consolidated the two cases.

{¶5} On February 17 and 28, 2017, a magistrate held a hearing on Grandmother's complaint for custody and her motion for temporary custody or immediate placement of E.S.K. At the hearing, Grandmother provided testimony about her employment as a home health aide, a position she has had for over 20 years, her living and financial situations, and her visitations and relationship with E.S.K. This testimony indicated that Grandmother made $9.00 an hour as a home health aide and was living with her parents, E.S.K.'s great-grandparents ("Great-Grandparents"), in their home in Batavia, as the Agency's case plan required her to live separately from Mother. Prior to moving in with Great-Grandparents, Grandmother lived with Mother in a two-bedroom condominium in Cincinnati that Grandmother rented from her parents for $265 a month, which included rent and utilities. Great-Grandparents, who are in their 80s, paid the condominium's utilities, monthly condo fees, and semi-annual real estate taxes and intended to will the condominium to Mother upon their deaths. Grandmother planned to move back into the condominium after Mother found a place of her own and moved out of the residence.

{¶6} Grandmother testified that she has a close bond with E.S.K. and visited the child daily when E.S.K. was hospitalized. Once E.S.K. was released from the hospital into the Agency's care, Grandmother had weekly visitation. Grandmother had not missed a single visit with E.S.K., and during her visits with the child, would show affection to E.S.K., take pictures of E.S.K., help feed E.S.K., and play with E.S.K. Grandmother dismissed concerns the Agency expressed regarding her ability to properly support E.S.K.'s head and to refrain from being overly emotional during the visits, stating that she knew how to properly hold an infant and that she sometimes became emotional during the visits because it was difficult to have such a short amount of time with E.S.K. and for such time to be monitored

and occur at a visitation center. Grandmother admitted to leaving the visitation room on one occasion but denied that she left because she could not handle E.S.K.'s crying. Rather, Grandmother indicated that another parent visiting his or her children had started crying, which upset Grandmother.

{¶7} Grandmother further testified that if she were given custody of E.S.K., she planned to have Great-Grandparents watch the child while she was at work. If Great-Grandparents were unavailable, Grandmother would put E.S.K. in a nearby daycare. Grandmother believed it would cost approximately $125 per week for part-time placement in the daycare.

{¶8} Mother, Great-Grandfather, Grandmother's brother, and a daughter of one of Grandmother's clients all testified on behalf of Grandmother at the custody hearing. Mother was in favor of E.S.K. being placed in Grandmother's custody. Grandmother's brother and the client's daughter testified about Grandmother's kind, patient, and compassionate nature, with the client's daughter also noting that Grandmother had a "wonderful work ethic" and "follow[ed] the rules of her company to the letter."

{¶9} E.S.K.'s GAL, a home-study accessor from the Agency, and a visitation supervisor for the Agency also testified at the custody hearing. The GAL expressed that while it was clear that Grandmother loved E.S.K., the GAL was "not quite sure that [Grandmother] understands everything that needs to be done with the child," and the GAL had concerns about Grandmother's financial ability to care for the child. Nonetheless, the GAL supported Grandmother receiving temporary custody of E.S.K. to see how Grandmother would do caring for the child.

{¶10} The home-study accessor testified about concerns she had with Grandmother's honesty and ability to directly communicate with the Agency. Based on the accessor's own observations of Great-Grandparents' home and statements Mother made

to the accessor, the accessor believed Grandmother had not been staying at Great-Grandparents' home as frequently or for the duration that Grandmother claimed to have resided there. The accessor also had concerns about Grandmother's finances and her understanding of expenses associated with renting or owning a home.

{¶11} Both the home-study accessor and the visitation supervisor expressed concern over Grandmother becoming emotional during her visits with E.S.K. They both indicated that Grandmother could not tolerate E.S.K.'s crying, with the accessor observing that "if the child starts to cry and cries more than a few minutes [Grandmother] leaves the visit, she sits in the lobby and sobs." The visitation supervisor testified about an event that occurred on Grandmother's February 15, 2017 visit with the child, wherein Grandmother left E.S.K. alone on a bench in the visiting room so that she could take photographs of the child. The supervisor found this concerning, as there was a possibility that E.S.K. could have fallen off the bench and hurt herself.

{¶12} After considering the testimony presented at the February 17 and 28, 2017 hearing and considering the best interest factors set forth in R.C. 3109.04(F), the magistrate issued a decision denying Grandmother's complaint for custody and motion for temporary custody or immediate placement. Grandmother filed objections to the magistrate's decision and, at the objection hearing, sought to introduce a video recording of the February 15, 2017 visitation as the recording contradicted the visitation supervisor's claim that Grandmother left E.S.K. alone on a bench. The recording had not been available at the time of the custody hearing as the machine used to create the recording had been broken.

{¶13} The juvenile court granted Grandmother's request to take additional evidence, finding that the magistrate should consider the "newly discovered" recording in reaching a decision on Grandmother's motion for custody. The court further found that a mental health evaluation of Grandmother would be beneficial in determining Grandmother's ability to care

for E.S.K. and directed Grandmother to make arrangements with the Agency for an evaluation. The court remanded the matter to the magistrate for a hearing on these issues.

{¶14} Grandmother was evaluated by Barbara Brewer, a licensed psychologist. Brewer submitted a report to the juvenile court after obtaining background information about the case from Grandmother's attorney and the Agency, reviewing court documents and reports from the GAL and Agency, and meeting with Grandmother on three occasions. Brewer also testified about Grandmother's evaluation at the remand hearing, which was held on November 9, 2017.

{¶15} Brewer explained that when Grandmother took the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"), she attempted to present herself in a positive light and did not acknowledge her shortcomings. This was not surprising to Brewer, as Grandmother had a strong motivation to present herself in the best possible light as she wanted to obtain custody of E.S.K. When given an IQ test, the Wechsler Abbreviated Scale of Intelligence ("WASI-II"), Grandmother had an estimated IQ in the 80s, which caused Brewer to opine that Grandmother has "mild difficulties" and "some deficits in a more higher level of conceptual thinking." Although Brewer did not believe Grandmother's "mild difficulties" would interfere in the "normal activities of daily living," she was concerned that Grandmother's inability to think on a more conceptual level could affect her ability to understand proper child development.

{¶16} During her meetings with Grandmother, Brewer did not observe Grandmother sobbing or having emotional outbursts, as described by the Agency in its reports. Grandmother did get "very teary" when discussing the situation with E.S.K., and Brewer had concerns about Grandmother's "emotional volatility." Brewer believed Grandmother overestimated what she could handle when it came to caring for E.S.K. and "under estimate[d] the stress and all that could happen here." Brewer noted that while

Grandmother raised Mother, she did so only with a significant amount of financial and emotional support from Great-Grandparents. Brewer had concerns about Grandmother's ability to handle the stress of raising a teenage girl when Grandmother was in her 70s. Brewer ultimately opined that E.S.K. should remain in the care of her foster parents with arrangements made to allow Grandmother more contact with the child. However, after Brewer admitted that her opinion was formed without having viewed Grandmother's interactions with E.S.K. and that such observations would be helpful, the magistrate continued the hearing to allow Brewer time to watch videos of Grandmother's visitations with E.S.K. and to personally observe a visitation.

{¶17} Prior to adjourning the November 9, 2017 hearing, the magistrate viewed the "newly discovered" recording of Grandmother's February 15, 2017 visitation with E.S.K. The magistrate found that the recording contradicted the visitation supervisor's testimony about Grandmother leaving E.S.K. alone on a bench, and the magistrate ruled that the visitation supervisor's testimony would be "totally disregarded."

{¶18} The hearing continued on January 30, 2018, with Brewer testifying she had attended a one-hour visitation between Grandmother and E.S.K. and had viewed recordings of Grandmother's prior visitations. Brewer opined that Grandmother was "perfectly appropriate" when interacting with the child and that E.S.K. was "quite comfortable" with Grandmother. Based on her observations, Brewer had "no concerns whatsoever about * * * [Grandmother] taking care of [E.S.K] on * * * regular, day-to-day kinds of interactions." However, since the date of the last hearing, Brewer had obtained new information relating to medical issues E.S.K. had recently been diagnosed with and these medical issues caused Brewer concern about Grandmother's ability to properly care for the child. Brewer stated that she had been advised by E.S.K.'s foster mother ("Foster Mother") that E.S.K. had been diagnosed with a genetic disorder known as alpha-1

antitrypsin deficiency ("A1AT"), which created a risk for serious liver and lung issues for the child. Brewer had also been informed by Foster Mother that because E.S.K.'s hemoglobin was low and her liver enzymes elevated, E.S.K. had started seeing an endocrinologist for her health needs. Additionally, as E.S.K. had severe issues involving gaining weight and growing, and at one point was "borderline failure to thrive," E.S.K. had started seeing a dietician. E.S.K. also had oral motor delay and a lazy eye, the latter of which would require surgery. Given E.S.K.'s medical issues and Grandmother's "mild intellectual difficulties," Brewer had concerns about whether Grandmother would take E.S.K.'s medical issues seriously and whether Grandmother would be "able to follow through and really fully understand and be able to handle all of the many medical appointments."

{¶19} On cross-examination, Brewer admitted that the only information she had about E.S.K.'s medical issues and treatment needs came from her conversation with Foster Mother. Brewer had not reviewed E.S.K.'s medical records or spoken to E.S.K.'s medical providers. Brewer was unsure of what type of communication, if any, had occurred between the Agency and Grandmother regarding E.S.K.'s medical status.

{¶20} Following Brewer's testimony, Grandmother's counsel asked that the hearing be continued so that additional evidence, and perhaps a second opinion, could be obtained regarding Grandmother's ability to care for E.S.K. given her recent A1AT diagnosis. The magistrate denied counsel's request and proceeded to render a decision on the merits of Grandmother's custody motion. The magistrate found that custody and placement of E.S.K. in Grandmother's care was not in E.S.K.'s best interest, relying on E.S.K.'s recent medical diagnosis. The magistrate stated that Grandmother "does not appear to be currently capable of handling the immense day to day responsibilities of being the primary caretaker for the young child in the situation which confronts the Court. Particularly a child with a genetic medical condition." Grandmother filed objections to the magistrate's decision,

which were overruled by the juvenile court on June 18, 2018. Two days later, the Agency moved for permanent custody of E.S.K. Thereafter, Grandmother appealed from the denial of her complaint for custody and her motion for temporary custody or immediate placement of E.S.K. The Agency's motion for permanent custody was stayed, pending a resolution of Grandmother's appeal.

{¶21} In *In re E.S.K.*, 12th Dist. Clermont No. CA2018-07-053, 2019-Ohio-1588, we reversed the juvenile court's denial of Grandmother's complaint for custody and motion for temporary custody or immediate placement and remanded the matter with instructions for the juvenile court to "hold a hearing on the issue of E.S.K.'s medical diagnosis and any issues arising therefrom relative to Grandmother's request for custody. At the hearing, Grandmother shall be permitted to introduce relevant evidence regarding the child's issues and her ability to care for the child given those medical issues." *Id.* at ¶ 49. In reaching this determination, we noted that the medical testimony presented at the January 30, 2018 hearing concerning E.S.K. had resulted from double hearsay, as Brewer testified about information she obtained from Foster Mother, who had obtained the information from E.S.K.'s medical providers. Brewer had not reviewed any medical records pertaining to E.S.K. and had no independent knowledge of E.S.K.'s medical issues. *Id.* at ¶ 46. Additionally, it appeared from the record that E.S.K.'s recent A1AT medical diagnosis had not been communicated to Grandmother or her counsel prior to the hearing. *Id.* at ¶ 47. By allowing the hearsay medical testimony and denying Grandmother's counsel's request for a continuance to obtain more information about E.S.K.'s recent diagnosis, Grandmother was denied "the opportunity to assemble evidence or witnesses to rebut, explain, or otherwise challenge the medical testimony offered at the January 30, 2018 hearing." *Id.* at ¶ 48.

{¶22} On September 13, 2019, the magistrate held a combined hearing on the Agency's motion for permanent custody and the remanded issue relating to Grandmother's complaint and motion for custody or immediate placement of E.S.K. At this time, the parties stipulated to the admission of six exhibits. These exhibits were comprised of three reports from E.S.K.'s doctors, a summary of E.S.K.'s medical history that was prepared by Foster Mother, the judgment entry sentencing Father to 36 months in prison for sexual battery, and the warrant conveying Father to prison in August 2018. Grandmother's counsel also stipulated that compliance with the remand instructions in *In re E.S.K.*, 2019-Ohio-1588, would be accomplished by the admission of the medical reports, Foster Mother's testimony as to the import of those issues in caring for the child, and testimony from Grandmother and Mother's former pediatrician regarding Grandmother's ability to care for E.S.K. in light of the medical challenges the child faces.

{¶23} Elizabeth Schorry, M.D., a professor of clinical pediatrics in the Division of Human Genetics at Cincinnati Children's Hospital, submitted a report discussing E.S.K.'s genetics and the serious and potentially life-threatening conditions the child faces as a result of the genetic overlap caused by E.S.K.'s father also being her grandfather. Dr. Schorry's report notes that E.S.K. was born prematurely and she has had a slow growth in weight and length since her birth. The doctor explained that E.S.K. has an increased risk for developmental delays and learning problems because of Mother's developmental delays. Additionally, E.S.K. has behavioral problems and speech delay, including articulation errors and possible speech apraxia.

{¶24} Dr. Schorry's report notes that E.S.K. has the A1AT genetic disorder, with a ZZ genotype. The ZZ genotype is the most severe form of A1AT and can lead to abnormal liver function, liver failure, and cirrhosis. As young adults, individuals with A1AT are at high risk for developing chronic lung disease if exposed to cigarette smoke. Given the very close

genetic relationship of her biological parents, Dr. Schorry warned that "there may be many other recessive genetic disorders that [E.S.K.] is at risk for, which have not yet been detected. These could be disorders that have onset in later childhood or adulthood."

{¶25} As a result of E.S.K.'s A1AT diagnosis and current medical condition, Dr. Schorry recommended that E.S.K. closely follow up with her pediatrician and multiple specialists, including medical providers in the areas of pediatrics, genetics, gastroenterology/liver, pulmonary, ophthalmology and developmental pediatrics. Dr. Schorry further recommended E.S.K. attend frequent speech therapy, with a goal of twice per week, to address speech delays, attend a special-needs preschool, have periodic blood tests to monitor her liver, avoid exposure to secondhand smoke, and obtain additional genetic testing to identify other genetic conditions putting her at risk. Finally, Dr. Schorry stated in her report that

> [E.S.K.] should be placed in a stable environment with a caregiver who can manage her somewhat complex medical and developmental needs. I have had the opportunity to meet with her foster mother on several occasions, and I feel that she has provided a stable, nurturing environment for [E.S.K.], where [E.S.K.] has been thriving. I have not had the opportunity to meet with the other family members so [I] cannot assess their ability to care for [E.S.K.]. However, I would be concerned about the potential negative impact on [E.S.K.'s] behavior and adjustment if she were moved to a different setting after 3 years in a stable environment.

{¶26} Amy Taylor, M.D., works in the Division of Pediatric Gastroenterology, Hepatology, and Nutrition at Cincinnati Children's Hospital. She provided a report based on E.S.K.'s medical records and the verbal history provided to her. Dr. Taylor noted that E.S.K. was first seen in the Pediatric Liver Care Center in September 2017 and she was subsequently diagnosed with A1AT with ZZ genotype. Dr. Taylor stated that the occurrence of liver disease in young children with A1AT deficiency is highly variable, with three to five percent having the life-threatening disease. A small percentage of children with the disease

will need a liver transplant. A larger portion of children with A1AT deficiency, around 29 percent, will develop portal hypertension, which leads to ascites or gastrointestinal bleeding. Because A1AT children are predisposed to lung disease, these children should not be exposed to cigarette smoke.

{¶27} Dr. Taylor testified that children with A1AT should be screened at least annually for complications related to A1AT and possible liver disease. Screenings should include laboratory testing, ultrasound testing, and a physical exam. Possible complications include impaired blood clotting, cirrhosis, liver tumors, and poor growth. Dr. Taylor noted that E.S.K. has been screened at least twice per year since her A1AT diagnosis. Her July 2019 screening showed normal liver function and transaminases within the normal range. Dr. Taylor stated E.S.K. will need additional monitoring and screening throughout her childhood and adolescence.

{¶28} Ann Rooney, a registered dietician nutritionist and licensed dietician associated with Cincinnati Children's Hospital outpatient clinic, issued a report stating that she has been treating E.S.K. since April 3, 2017. Rooney stated that E.S.K. "has always been a picky/problem eater" and is resistant to drinking fluids. Rooney recommended that E.S.K. have exposure to food five times per day, that there be a minimum of two hours and a maximum of four hours between presenting any caloric food or beverage to E.S.K. to allow her to feel hunger, that E.S.K. be given only water to drink between meals and that all juice and sweetened beverages be avoided, that milk be given to E.S.K. only at the end of meals and limited to 18 ounces per day, with additional calcium being provided through cheese, yogurt and cottage cheese, that a protein-based food be included at feedings, that E.S.K. have meals while seated with minimal distractions and no electronics, and that a caregiver be seated with E.S.K. to encourage eating and to watch for choking. Rooney's

report notes that Foster Mother has implemented the recommendations and that "[E.S.K.] has improved under the care of [foster parents]."

{¶29} Foster Mother's written summation of E.S.K.'s medical history and her testimony at the hearing indicated that E.S.K. has faced significant medical challenges since her birth. Foster Mother estimated that since E.S.K.'s birth, she had taken E.S.K. to more than 160 medical appointments. Foster Mother is able to take E.S.K. to all these appointments as she a stay-at-home mother.

{¶30} Foster Mother testified that providing E.S.K. the nutrients she needs to grow and stay healthy has been challenging. As E.S.K. was premature and had a very low birth weight, E.S.K. had to be fed a special, high-calorie formula that was required to be prepared a specific way. In February 2017, Foster Mother started introducing E.S.K. to solid foods and noticed E.S.K. had difficulty swallowing. Additionally, if E.S.K. ate solid food, her liquid intake significantly decreased. Because of these issues, E.S.K.'s pediatrician referred the child to a speech pathologist and a dietician.

{¶31} The referral to the speech pathologist led to E.S.K. being diagnosed with oral motor delay and dysphagia, meaning her tongue and mouth were not moving normally. E.S.K. started seeing a speech therapist every other week so that she could learn how to move food from her mouth to the back of her throat in order to swallow.

{¶32} E.S.K.'s referral to the dietician resulted in weekly appointments to discuss E.S.K.'s nutrition and calorie intake. E.S.K. has difficulty consuming calcium, as she will not consume any form of milk – whether it's soy, almond, cow, or goat milk. She also will not drink any version of a child nutrition supplement. This requires Foster Mother to introduce calcium rich foods, such as cheeses and yogurt, to the child to ensure proper nutrition. However, getting E.S.K. to eat these foods, or any other, is not easy. Foster Mother explained that before E.S.K. will eat a food she must first "experience" the food by

kissing and licking the food. E.S.K. might then eat the food. E.S.K. must typically experience food seven or eight times before she will eat it, so it is necessary for Foster Mother to expose her to various foods multiple times. However, even if E.S.K. eats a certain food one day, she might reject it the next day. There is no guarantee that she will consume a food regularly. If E.S.K. gets the same food at the same meal more than two days in a row, she tends to reject the food and will not eat it for a couple of months. Given these particularities, it is necessary for Foster Mother to feed E.S.K. a wide variety of foods.

{¶33} Keeping E.S.K. hydrated is also a challenge as she does not like to drink straight water or milk. Foster Mother has to regulate E.S.K.'s fluids by feeding her certain foods and tracking the amount of liquid in each item E.S.K. ingests. For example, Foster Mother knows that if she can get E.S.K. to eat two or three strawberries, then E.S.K. has ingested the equivalent of two or three ounces of liquid. To ensure E.S.K. has sufficient hydration, Foster Mother tracks all the food E.S.K. ingests and the water content in each item.

{¶34} Regular and ongoing consultation with E.S.K.'s nutritionist occurs to ensure that E.S.K. is receiving the nutrients she needs. While E.S.K. initially saw the nutritionist weekly, her appointments now occur once a month. At these appointments, the nutritionist reworks E.S.K.'s calorie count and suggests different food regimens, depending on the food E.S.K. is currently eating or rejecting. Based on the consultation with the nutritionist, E.S.K.'s daily allowance of protein, calcium, and the like change, so Foster Mother must closely track E.S.K.'s daily intake of food.

{¶35} Foster Mother explained that being home with E.S.K. has allowed her to closely monitor E.S.K.'s food and beverage intake. E.S.K. attends preschool four days a week for three hours each day, from 9:20 a.m. to 12:15 p.m. E.S.K. is not given a lunch but is given a snack at school. E.S.K.'s preschool teachers follow E.S.K.'s dietary regimen.

{¶36} In July 2017, E.S.K. was referred to an endocrinologist. Following a liver enzyme test, E.S.K. was referred to the genetics clinic and to liver and gastrointestinal specialists. Testing by these specialists ultimately culminated in the A1AT diagnosis. Foster Mother explained that E.S.K.'s A1AT diagnosis means that E.S.K. lacks 80 percent of the protective coating in her lungs and that she cannot be exposed to cigarette smoke. Foster Mother also attempts to keep E.S.K. away from other airborne pollutants, including exhaust and paint fumes, campfires, and excessive dust.

{¶37} Foster Mother testified that with E.S.K.'s A1AT diagnosis, it is also important for E.S.K. to avoid any kind of viral or bacterial infection, as such infections can adversely affect her liver function. If E.S.K. does get sick, she cannot take any medications, be it oral or topical, including over-the-counter medication, unless the medicine is cleared with a physician. For example, when E.S.K. came down with the flu, Children's Hospital had to be consulted about whether it was safe to give E.S.K. Tamiflu. If E.S.K. develops a fever, she is not permitted to take Tylenol until her temperature exceeds 102 degrees Fahrenheit.

{¶38} E.S.K.'s A1AT diagnosis also affects her dietary needs and will require that she consult with a nutritionist for the rest of her life. She will also need routine testing of her blood and liver numbers to ensure she does not develop liver disease.

{¶39} In December 2017, E.S.K. was referred to an ophthalmologist as she was having difficulty seeing far away and was crossing her eyes. Attempts to fix the issue using glasses were not successful and E.S.K. had eye surgery to correct the problem. E.S.K.'s vision has straightened out, but she still requires a topical medication in one eye twice a week and will need to wear glasses for the rest of her life.

{¶40} In June 2018, E.S.K. began exhibiting behavioral problems. She would throw extreme tantrums, during which she was inconsolable and would bang her head on hard surfaces. As a result, E.S.K. received a referral to a developmental and behavioral

psychologist. E.S.K. received a psychiatric evaluation, as well as assessments by occupational, physical, and speech therapists. Those assessments in turn led to a referral to Help Me Grow, which recommended E.S.K. participate in its early childhood intervention program ("ECIP"). Foster Mother took E.S.K. to all of the ECIP services, which included speech, fine motor strength, and behavioral therapy two times a month, and a once-a-month group play date. In January 2019, Foster Mother began a 12-week program of parent-child interaction therapy with E.S.K.

{¶41} Foster Mother explained that E.S.K. has difficulty speaking, as she often drops syllabus at the beginning or end of words. E.S.K.'s speech sounds like jabbering. E.S.K. receives one-on-one speech therapy weekly at Children's Hospital and receives 120 minutes of speech therapy each month at her preschool, where E.S.K. is on an IEP. Foster Mother also works with E.S.K. on her speech every day.

{¶42} In addition to testifying about the various medical and therapeutic appointments she and E.S.K. attend, Foster Mother testified about E.S.K.'s integration into the family. She stated that she and her husband are licensed to adopt and, if the opportunity arises, they wish to adopt E.S.K. E.S.K. is bonded to her foster parents and their adopted son. E.S.K. likes going to her foster brother's sporting events, where she cheers him on and plays with her friends. E.S.K. enjoys going to museums, the zoo, and the aquarium with her foster family. She also enjoys outdoor activities, such as going on walks, swimming, and riding her tricycle. E.S.K. is doing well in her preschool. She has neighborhood friends she plays with, and she visits with her foster grandparents at least once a week.

{¶43} E.S.K.'s Agency caseworker also testified at the hearing. While a significant portion of her testimony was spent discussing Mother and Father's failure to comply with case plan requirements, the caseworker also testified about E.S.K.'s placement. The

caseworker explained that while several relatives had expressed an interest in seeking custody of E.S.K., only Grandmother had followed through. Great-Grandparents had never filed for custody and a motion for custody filed by E.S.K.'s cousins was later withdrawn.

{¶44} The caseworker explained that E.S.K. has been in the same foster home since she was 10 days old and that all of E.S.K.'s needs, including her many medical needs, are met in this placement. The caseworker testified that E.S.K. is a very happy child who has bonded with her foster family. During her home visits, the caseworker observed that E.S.K. seeks comfort from her foster parents when she is upset. The caseworker also observed that when foster father returns home at the end of his workday, E.S.K.'s face lights up and she runs to give him a hug.

{¶45} E.S.K.'s GAL also testified at the hearing. She explained that she visits E.S.K. monthly and has spoken with Grandmother frequently over the three years she has been involved in E.S.K.'s case. While the GAL had recommended in May 2017, that E.S.K. be placed with Grandmother, the GAL's recommendation has changed and she now recommends that E.S.K. be placed in the Agency's permanent custody. The GAL explained her recommendation changed after she was informed of E.S.K.'s A1AT deficiency diagnosis and the results of Grandmother's evaluation with Brewer. The GAL was concerned that Grandmother may not be able to understand all the medical issues E.S.K. faces. As she explained, "it takes a while to even get your head around [the medical problems], how complex it is." In addition to concerns that Grandmother may not understand E.S.K.'s medical needs, the GAL is also concerned about Grandmother's ability to take E.S.K. to all of her medical appointments. Though she had not discussed this issue with Grandmother, the GAL knew Grandmother had a full-time job which did not give her unlimited flexibility to make or attend medical appointments.

{¶46} Another factor that led to the GAL's recommendation in favor of permanent custody was the length of time E.S.K. had been living with the foster family. As the GAL noted, E.S.K. has lived with the foster family for more than three years – since she left the hospital after her birth. The foster family's home is the only environment E.S.K. has ever known and the GAL was concerned removing E.S.K. from the foster family's care would be very disruptive.

{¶47} Grandmother disputed that she would be unable to care for E.S.K., even with all of E.S.K.'s medical needs. Grandmother believes she can care for E.S.K., in part, because of her more than 20 years of experience as a home health aide. Grandmother explained  that as a health aide, she has cooked, fed, and cared for her clients' needs. Grandmother is trained in CPR and has utilized that training two times in the past 15 years.

{¶48} With respect to her ability to take E.S.K. to her various medical appointments while maintaining her job, Grandmother testified that she believed her employer would be flexible. As long as Grandmother was able to give her employer advance notice of the appointments, Grandmother believed her employer would modify her work schedule. Grandmother explained that in the past, when she was raising Mother, her employer gave her time off to take Mother to medical appointments.

{¶49} Grandmother also explained that she would have help caring for E.S.K. and her various medical needs. Grandmother stated her new husband, her brother, and her sister-in-law were willing to help out. Grandmother's husband receives social security disability and is home all day. He is a licensed driver and is willing to help with transportation to E.S.K.'s various medical appointments. Grandmother's husband is also willing to help with general caregiving, such as giving baths and feeding E.S.K.

{¶50} Grandmother further testified that she believes her experience raising Mother and responding to various medical issues Mother faced as a child demonstrates her ability

to properly care for E.S.K. Grandmother testified about various health issues Mother faced when she was younger. When Mother was first born, she had dietary issues, but Grandmother was able to follow the advice of a pediatrician by feeding Mother soy formula. As Mother grew, she suffered from multiple ear infections and bouts with bronchitis and strep throat. Mother would get high fevers that would cause seizures. Grandmother took Mother to the hospital when this occurred. Mother ended up having her tonsils and adenoids removed and tubes placed in her ears, which, for the most part, stopped the ear infections and seizures. Grandmother recalled one occasion where Mother had an allergic reaction to an antibiotic she was taking. Grandmother appropriately handled the situation by calling 9-1-1 and taking the child to the doctor. On another occasion, Mother got her leg caught in an exercise bike. Grandmother was able to free Mother and take her to the doctor for her injuries.

{¶51} Grandmother had Mother's pediatrician, Monique Slavin, M.D., testify about Grandmother's ability to attend to Mother's childhood medical issues. Dr. Slavin explained that Mother became a patient in July 1988, when Mother was three years old. Dr. Slavin saw Mother several times a year, with Mother's last visit to Dr. Slavin occurring in 2005. Dr. Slavin testified that Grandmother had always been appropriately concerned about her daughter's health and that she had followed up appropriately on Mother's medical issues, which involved ear, nose and throat problems that resulted in a tonsillectomy and the insertion of ear tubes. Grandmother also kept up with her daughter's immunizations and recommended periodic checkup examinations.

{¶52} Dr. Slavin recalled that Mother experienced developmental issues as a child and that Grandmother took her for assessment at Children's Hospital. When concerns arose that Mother might have a heart condition, Grandmother appropriately followed up by

taking Mother to a cardiologist. Dr. Slavin could not recall any instances where Grandmother failed to follow up on a medical issue Mother faced as a child.

{¶53} Grandmother's sister-in-law testified that she has known Grandmother for about 34 years. She typically saw Grandmother once or twice per month. Sister-in-law testified that she found Grandmother to be a wonderful, loving mother who was "on top of everything." Sister-in-law explained that she had been surprised at how sickly Mother had been as a child and was impressed by Grandmother's ability to deal with Mother's medical issues, which included high fevers, problems with her ears, and occasional seizures. Sister-in-law believed that Grandmother would be able to handle any emergency situation that arose, would be able to follow doctor's orders on how to properly care for E.S.K., and would not crumble under the pressure.

{¶54} On January 7, 2020, after considering the foregoing testimony and exhibits, the magistrate issued a decision granting the Agency's motion for permanent custody and denying Grandmother's complaint for custody and her motion for temporary custody or immediate placement. The magistrate determined that the Agency had demonstrated by clear and convincing evidence that E.S.K. had been in the Agency's custody for more than 12 months of a consecutive 22-month period. Furthermore, after considering the best interest factors set forth in R.C. 2151.414(D)(1) and 3109.04(F)(1), the magistrate found that "the Agency having permanent custody, rather than Grandmother having custody, best serves E.S.K.'s interests."

{¶55} Grandmother filed timely objections to the magistrate's decision, arguing that the denial of her request for custody was not in E.S.K.'s best interest and that the magistrate failed to "appropriately weigh the statutory custody factors." A hearing on Grandmother's objections was held on February 19, 2020. Thereafter, on May 12, 2020, the juvenile court

issued a decision overruling Grandmother's objections and adopting the magistrate's decision.

{¶56} Grandmother appealed the juvenile court's decision, raising the following as her only assignment of error:

{¶57} THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN DENYING [GRANDMOTHER'S] REQUEST AND COMPLAINT FOR CUSTODY AND PLACEMENT FOR E.S.K.

{¶58} Grandmother argues the juvenile court abused its discretion in denying her complaint for custody and her motion for temporary custody and immediate placement of E.S.K. because the evidence introduced at the hearing demonstrated it was in E.S.K.'s best interest for Grandmother to be named legal custodian and residential parent. Grandmother contends the court "failed to adequately consider the importance of maintaining family unity and a relationship with the minor child's biological family in the best interest determination." She further contends the juvenile court "erred by relying on the length of time E.S.K. had been placed with the [f]oster [f]amily as the primary basis for denying Grandmother's [m]otion for [c]ustody."

{¶59} "[R]elatives seeking custody of a child are not afforded the same presumptive rights that a natural parent receives." *In re A.B.*, 12th Dist. Clermont No. CA2013-03-024, 2013-Ohio-3405, ¶ 34. "A juvenile court is not required to find by clear and convincing evidence that a relative is an unsuitable placement option; rather, when a grandparent seeks legal custody, the inquiry focuses on what is in the best interest of the child." *In re K.S.*, 12th Dist. Warren No. CA2019-01-009, 2019-Ohio-2384, ¶ 36, citing *In re A.B.* at ¶ 34. "[W]hile 'blood relationship' and 'family unity' are factors to be considered when determining a child's best interest, neither one is controlling." *In re S.K.G.*, 12th Dist. Clermont No. CA2008-11-105, 2009-Ohio-4673, ¶ 12. Instead, the court "should consider

the totality of the circumstances affecting the best interest of the child." *In re S.L.*, 12th Dist. Butler Nos. CA2012-07-137 thru CA2012-07-142 and CA2012-07-147 thru CA2012-07-149, 2013-Ohio-781, ¶ 54. Factors a court should consider when determining the best interest of a child are codified in R.C. 3109.04(F)(1) and include, but are not limited to: (1) the wishes of the child's parents; (2) the child's wishes; (3) the child's interactions and interrelationships with parents, siblings, and other persons who may significantly affect the child's best interests; (4) the child's adjustment to home, school, and community; and (5) the mental and physical health of all persons involved in the situation. R.C. 3109.04(F)(1)(a)-(e).[1]

{¶60} A reviewing court will not reverse a juvenile court's custody decision absent an abuse of discretion. *In re A.C.*, 12th Dist. Clermont No. CA2006-12-105, 2007-Ohio-3350, ¶ 15. An abuse of discretion constitutes more than an error of law or judgment; it requires a finding that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "The discretion granted to a juvenile court in custody matters 'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In re A.C.* at ¶ 15, quoting *In re A.W.-G.*, 12th Dist. Butler No. CA2003-04-099, 2004-Ohio-2298, ¶ 6.

{¶61} After a thorough review of the record, we find that the juvenile court did not

---

1. In addition to the factors set forth in R.C. 3109.04(F)(1), the magistrate and juvenile court also considered the best interest factors set forth in R.C. 2151.414(D) in ruling on Grandmother's and the Agency's respective motions. These factors included (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes; (3) the custodial history, including whether the child has been in the Agency's custody for 12 or more months of a consecutive 22-month period; and (4) the child's need for legally secure placement and whether that type of placement can be achieved without a grant of permanent custody. R.C. 2151.414(D)(1)(a)-(d). As this court has previously recognized, a juvenile court may consider the best interest factors set forth in either R.C. 3109.04(F)(1) or R.C. 2151.414(D) when making a custody determination after a child has been adjudicated abused, neglected, or dependent. *In re K.S.*, 12th Dist. Warren No. CA2019-01-009, 2019-Ohio-2384, ¶ 37.

abuse its discretion in denying Grandmother's complaint for custody or motion for temporary custody or immediate placement. We further find that the manifest weight of the evidence supports the court's denial of Grandmother's complaint and motion. The record reveals that the magistrate and juvenile court considered all relevant best interest factors. Although Mother and Grandmother both wish for custody to be awarded to Grandmother and the facts indicate Grandmother has a strong bond with the child, the remaining best interest factors weigh in favor of custody remaining with the Agency.

{¶62} Since she was 10 days old, E.S.K. has been in the Agency's custody. Foster Parents' home is the only home E.S.K. has ever known, as she has lived with her foster family for the duration of the case. By all accounts, the child has done very well in Foster Parents' care. E.S.K. loves and is bonded to her foster family. E.S.K. enjoys doing family activities with them, such as going to her foster brother's sporting events and on outings to the zoo, aquarium, and museums. E.S.K. has developed a relationship with her extended foster family, spending time with her foster grandparents on a weekly basis.

{¶63} E.S.K. has made friends in Foster Parents' community. She plays with neighborhood children and with friends at her brother's sporting events. She is enrolled in a preschool in Foster Parents' neighborhood and is doing well there. E.S.K. is on an IEP and receives 120 minutes of speech therapy each month at her preschool.

{¶64} Foster Parents have handled the many medical issues that E.S.K. has faced since her placement in their home. E.S.K.'s early birth, nutrition problems, slow growth in weight and length, A1AT deficiency diagnosis, speech delays, and vision problems have required more than 160 medical appointments, numerous medical tests, multiple speech and behavioral therapy sessions, and an eye surgery. Because Foster Mother is a stay-at-home mother, she has the time and flexibility to take E.S.K. to her various appointments. Additionally, Foster Mother is able to closely track E.S.K.'s liquid and calorie intake – a

process that takes considerable planning, monitoring, and adjudgments. Foster Mother's testimony and the report from E.S.K.'s nutritionist demonstrates that adherence to the nutritionist's recommendations is important to ensure E.S.K.'s continued growth and health.

{¶65} Foster Mother's testimony and the reports from Dr. Taylor and Dr. Schorry indicate that E.S.K.'s A1AT diagnosis is serious. E.S.K. has the most severe form of A1AT and faces serious and potentially life-threatening conditions, such as liver failure, cirrhosis, and chronic lung disease. Because of E.S.K.'s A1AT diagnosis, she will need routine laboratory testing, ultrasound testing, and physical examinations throughout her life to ensure proper liver functioning. She will also need to avoid cigarette smoke and other airborne pollutants as she lacks 80 percent of the protective coating in her lungs. Foster Mother has taken steps to ensure E.S.K. avoids cigarette smoke, exhaust and paint fumes, campfires, and excessive dust in her everyday life.

{¶66} As the Agency caseworker, GAL, and E.S.K.'s doctors attested in their testimony and reports, E.S.K.'s foster parents have done a great job meeting E.S.K.'s medical needs. Dr. Schorry and the GAL have concerns about removing E.S.K. from her foster home, with Dr. Schorry stating that Foster Mother "has provided a stable, nurturing environment for [E.S.K.], where [E.S.K.] has been thriving. * * * I would be concerned about the potential negative impact on [E.S.K.'s] behavior and adjustment if she were moved to a different setting after 3 years in a stable environment." The GAL expressed similar concerns, noting that removing E.S.K. from foster family's care would be disruptive.

{¶67} Grandmother incorrectly asserts that the juvenile court relied on the length of time E.S.K. has been with the foster family as the "primary basis" for denying her complaint and motion for custody of E.S.K. While the amount of time E.S.K. has spent in foster family's care was certainly a consideration for the court, it was not the sole basis for the court's decision. In addition to considering the potential negative effects of removing E.S.K.

from the only home she has ever known, the court also considered Grandmother's ability to care for E.S.K. The court noted that while Grandmother had presented evidence that she was a hard worker, a good and loving caregiver, and an individual who had appropriately responded to her child's medical needs as Mother grew into adulthood, Grandmother had not "demonstrate[d] that she has ever had to deal with health issues as extreme as those for which [E.S.K.] presents." The emergency and caretaking situations Grandmother, her sister-in-law, and Dr. Slavin described in their testimony were of general pediatric aliments and doctor visits which, on a whole, were not all that unusual or time intensive. The seizures Mother suffered at a young age were resolved by surgery to remove her tonsils and adenoids. As the magistrate noted, "[Mother's] issues pale in comparison to the extraordinary difficulties which [E.S.K.] has faced and may well face int the future."

{¶68} There is a concern as to whether Grandmother would be able to develop the requisite skills and knowledge or have the time to deal with E.S.K.'s issues. Grandmother's WASI-II IQ test indicates that Grandmother has "mild difficulties" and some deficits in a higher level of conceptual thinking, leading both the GAL and Brewer to express concerns about Grandmother's ability to fully appreciate the complex medical issues E.S.K. faces. The GAL and Brewer were also concerned about whether Grandmother would have the time and flexibility to take E.S.K. to her various medical appointments or to adequately track and monitor her food intake. While Grandmother may have the ability to care for a child in regular day-to-day situations, that is notably different than the extraordinary demands brought on by E.S.K.'s genetic condition and her dietary needs. As the juvenile court noted, whether Grandmother or someone she might let care for E.S.K. would be able to meet the child's medical and nutritional needs is an unknown quantity and "[t]he Court is not [required] to experiment with the child's physical or emotional health." *See In re B.K.F.*, 12th Dist. Butler No. CA2016-04-078, 2016-Ohio-5474, ¶ 21 (noting that a trial court is not

required to experiment with a child's best interest in order to allow a party to prove that he or she should have custody of a child).

{¶69} Accordingly, after reviewing the record, we find that the juvenile court did not abuse its discretion in denying Grandmother's complaint for custody and her motion for custody or immediate placement with the child. The court considered all relevant best interest factors and appropriately balanced those factors in determining that it was in E.S.K.'s best interest for Grandmother's complaint and motion for custody to be denied and for permanent custody to be granted to the Agency. Grandmother's sole assignment of error is, therefore, overruled.

{¶70} Judgment affirmed.

S. POWELL and PIPER, JJ., concur.